# EXHIBIT A

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*"), dated as of June 30, 2023, is entered into by and between Mitchell J. Magid, DMD, P.C., a Virginia professional corporation ("*Seller*"), and GeneralHealth Group Inc., a Florida corporation ("*Buyer*").

### RECITALS

WHEREAS, Seller is engaged in the business of Oral Surgery and related services (the "*Business*");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain of the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Ancillary Documents*" means the Bill of Sale, the Assignment and Assumption Agreement, Assignment and Assumption of Contracts, the Promissory Note, the Security Agreement and any other ancillary documents contemplated hereunder.

"*Assigned Contracts*" has the meaning set forth in Section 2.01(e).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 3.02(a)(ii).

"*Assumed Liabilities*" means those Liabilities set forth in Section 1.01 of the Disclosure Schedule, all of which Buyer hereby agrees to accept and fully assume.

"*Business Day*" means any day except Saturday, Sunday or any other day on which commercial banks located in Lynchburg, Virginia are authorized or required by Law to be closed for business.

"*Code*" means the Internal Revenue Code of 1986, as amended.

1

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

"*Contracts*" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"*Disclosure Schedules*" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"*Dollars or $*" means the lawful currency of the United States.

"*EBITDA*" shall mean earnings before interest, taxes, depreciation and amortization calculated in a manner consistent with past practice when the Business was conducted by Seller.

"*Encumbrance*" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Knowledge of Seller or Seller's Knowledge*" or any other similar knowledge qualification, means the actual knowledge of any director or officer of Seller.

"*Law*" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"*Liabilities*" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"*Permits*" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"*Restricted Business*" means any business practicing Dentistry and/or Oral Surgery

"*Seller Principals*" has the meaning set forth in Section 2.09.

"*Territory*" means each area within a five (5) mile radius of each of the office locations of 1612 Graves Mill Road, Lynchburg, VA 24502.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances other than permitted Encumbrances, all of Seller's right, title and interest in, to and under the following assets, properties and rights, which relate to, or are used or held for use in connection with, the Business (but specifically excluding the Excluded Assets as defined below (the "*Excluded Assets*") (collectively, the "*Purchased Assets*"):

2

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

(a)     all inventory and supplies used in connection with the Business ("*Inventory*");

(b)     all business bank accounts (excluding cash, cash equivalents and marketable securities);

(c)     75% of the Accounts Receivable as of the Closing Date, as set forth on Section 2.01(c) of the Disclosure Schedules (the "*Accounts Receivable*");

(d)     All rights in and to intellectual property, including, common law trademarks, tradenames, logos, service marks, websites, domain names, social media pages, telephone, fax numbers, email accounts, post office box numbers and other business schemes of identity and advertisements related to the Business;

(e)     all Contracts set forth on Section 2.01(e) of the Disclosure Schedules (the "*Assigned Contracts*");

(f)     all furniture, fixtures, equipment, machinery, tools, office equipment, supplies, computers, telephones and other tangible personal property, except for those items included in the Excluded Assets (the "*Tangible Personal Property*")

(g)     all Permits, to the extent assignable to Buyer;

(h)     copies of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any governmental authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), internal financial statements, marketing and promotional surveys, and files to the extent contained in the files turned over or otherwise provided to the Buyer during due diligence ("*Books and Records*"); and

(i)     All of the goodwill associated with the Seller.

**Section 2.02     Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include (the "*Excluded Assets*"):

(a)     Cash, cash equivalents and marketable securities;

(b)     All professional plaques, certificates, awards, books and personal stationary, which belong to Dr. Mitchell Magid, DMD personally and is located at the Business;

(c)     Organizational documents, bylaws, buy/sell agreements, minute books, transfer records, or other records related to the organization of Seller;

(d)     Employee benefit plans and contracts of insurance for employee group medical, dental and life insurance plans;

(e)     Vehicles of the Business;

3

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

(f)    All insurance policies insuring Seller; and

(g)    All items set forth in Section 2.02 of the Disclosure Schedules.

**Section 2.03    Purchase Price.** The aggregate purchase price for the Purchased Assets shall be **$2,420,000** plus the assumption of the Assumed Liabilities, subject to Adjustments set forth in Section 2.05 (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a)    Payment Date. The Purchase Price shall be paid to Seller as follows: (i) 36 monthly installments with a debt service coverage ratio of 1.42 (monthly EBITDA Calculation, *divided by* 1.42 *equals* monthly payment due to Seller) ("***Monthly Installments***") with the first payment to be made on the 30th day following the Closing Date (the "***First Payment Date***") and each of the remaining 35 Monthly Installments on thirtieth succeeding day, and (ii) remaining balance of the Purchase Price set forth in Section 2.03 above due on the third anniversary (37th month) of the First Payment Date. At the conclusion of each and every month following the Closing Date, Buyer shall prepare and deliver to Seller, a statement (the "***EBITDA Calculation***") setting forth Buyer's determination of debt service coverage ratio and corresponding payment to Seller. If Seller disputes any of the items contained in the EBITDA Calculation, Seller may deliver to Buyer written notice of such objection within thirty (30) days following the delivery of the EBITDA Calculation, setting forth in reasonable detail Seller's objection. If Seller timely delivers a written notice of objection as to the EBITDA Calculation, Buyer and Seller shall cooperate in good faith to resolve the dispute, and if Buyer and Seller are unable to resolve the dispute within thirty (30) days of the Buyer's receipt of such written objection(s), the dispute shall be submitted to an independent accounting firm mutually agreed by Buyer and Seller (which shall act as an expert and not an arbitrator) for final resolution. If Seller does not deliver a written notice of objection as to the EBITDA Calculation within thirty (30) days of their original delivery, Seller shall be deemed to have irrevocably agreed to all items and amounts contained in the EBITDA Calculation.

(b)    Interest Rate. The interest rate applicable to Monthly Installments shall vary from month-to-month in accordance with the then-current Applicable Federal Rates of short-term loans issued by the Internal Revenue Service from time to time.

(c)    Such payments shall be evidenced by a promissory note in the form attached hereto as Exhibit A (the "***Promissory Note***"). The Promissory Note shall be secured by the Purchased Assets pursuant to the terms of a security agreement in the form attached hereto as Exhibit B (the "***Security Agreement***").

**Section 2.04    Allocation of Purchase Price.** Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "***Allocation Schedule***") set forth on Section 2.04 of the Disclosure Schedules.

**Section 2.05    Adjustments.** All items listed below will be apportioned between the parties as of the Closing Date. Seller will be liable to the extent that the items listed below relate to any time period ending at or prior to 12:00 a.m. on the Closing Date, and Buyer will be liable to the extent such items relate to periods commencing after 12:00 a.m. on the Closing Date: (a) personal property, real estate and occupancy taxes; (b) rents, fees, costs, expenses and other items payable under any Assigned Contracts assigned to Buyer; (c) the utilities serving the Business, including sewer, gas, electricity, telephone, cable and internet service (unless such accounts are closed and new accounts are put in place by Buyer effective as of the day after the Closing Date); and (d) prepaid fees, costs and expenses, and all other fees costs and

4

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

expenses as are customarily prorated in transactions of this nature but that are not otherwise included in this Section. On the date which is thirty (30) days following the Closing Date, Buyer and Seller shall assess appropriate adjustments set forth in this Section 2.05, and Seller shall be entitled to prompt reimbursement for the same.

**Section 2.06    Accounts Receivable.**

(a)    In consideration of the Accounts Receivable, Buyer shall pay to Seller (in addition to and in no event in lieu of the Purchase Price set forth in Section 2.03) a sum equal to seventy-five percent (75%) of the total value of the Accounts Receivable as of the Closing Date, payable to Seller in monthly installments pursuant to the terms of the Promissory Note.

(b)    At Closing, Seller shall appoint Buyer or its designee as Seller's exclusive true and lawful agent and attorney-in-fact and grant to Buyer or its designee such special limited power of attorney and appointment for Seller (the "Power of Attorney"), with effect as of the Closing, solely for the following purposes:

(i)    To bill Seller's patients, in Seller's name and on Seller's behalf, for all billable services constituting the Accounts Receivable;

(ii)    To bill, in Seller's name and on Seller's behalf, all claims for reimbursement or indemnification from insurance companies and plans, all state or federally funded benefit plans, and all other third-party payers or fiscal intermediaries for all billable services constituting the Accounts Receivable;

(iii)    To collect and receive, in Seller's name and on Seller's behalf, to the extent permitted by law, all amounts received pursuant to the foregoing, to administer such accounts including, but not limited to, extending the time of payment of any such accounts for cash, credit or otherwise; discharging or releasing the obligors of any such accounts; suing, assigning or selling at a discount such accounts to collection agencies; or taking other measures to require the payment of any such accounts constituting the Accounts Receivable; and

(iv)    To take possession of, endorse in the name of Seller, and deposit any notes, checks, money orders, insurance payments, and any other instruments received in payment for the Accounts Receivable.

(c)    The Power of Attorney shall become effective as of the Closing Date with no further action required by Seller or Buyer.

(d)    Section 2.01(c) of the Disclosure Schedules shall be updated at close of business on the day immediately preceding the Closing Date. For the avoidance of doubt, all Accounts Receivable purchased hereunder shall be excluded from Seller's post-closing employment compensation with Buyer.

**Section 2.07    Employees.** Effective as of the Closing Date, the Seller shall terminate the employment of all of its employees. Buyer shall make an offer of employment to the employees terminated by Seller. With respect to employees who have accepted Buyer's offer of employment ("*Transferred Employees*"), Seller shall pay, discharge and be responsible for all liabilities and payment obligations in respect of or relating to its employees for periods ending on or before the Closing Date and all liabilities and obligations with respect to the Transferred Employees for periods beginning on or after the Closing Date shall be liabilities and obligations of the Buyer (and not the Seller). Notwithstanding the foregoing, Buyer hereby agrees and acknowledges that Buyer shall honor all accrued paid time off of all Transferred

5

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

Employees of Seller as of the Closing Date, and, following the Closing Date, shall implement policies and procedures which shall allow employees to "rollover" their pre-closing accrued paid time off for the then-current calendar year. Buyer shall provide Seller's employees the option to maintain pre-closing health insurance plans with Anthem Blue Cross and Blue Shield, subject to 50% reimbursement of policy premiums by Buyer.

> **Section 2.08   Post-Closing Operation of Business.** Buyer warrants and covenants, which warranty and covenant shall survive the Closing Date so long as any amounts remain due and owing under the Promissory Note, that (a) Buyer shall use its best efforts to operate the Business in such a manner as to maximize EBITDA and repay Seller as quickly as possible, and (b) Buyer shall not take any action with a goal of shifting assets, income, activities or opportunities of the Business to other businesses or entities and shall affirmatively take those actions reasonably necessary or desirable to maximize the income of the Business.

> **Section 2.09   Post-Closing Information Rights and Reports.** At any time when any balance under the Promissory Note remains due and owing, Seller and the Seller Principals shall have full access to all of the books and records of the Buyer, including, without limitation, all financial and client information relating to the Business.

### ARTICLE III
### CLOSING

> **Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take place by exchange of documents and signatures (or their electronic counterparts), at 12:01am on June 30, 2023, or such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "*Closing Date*".

> **Section 3.02   Closing Deliverables.**

> > (a)   At the Closing, Seller shall deliver to Buyer the following:

> > > (i)   a bill of sale in the form of Exhibit C hereto (the "*Bill of Sale*") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer; and

> > > (ii)   an assignment and assumption agreement in the form of Exhibit D hereto (the "*Assignment and Assumption Agreement*") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities; and

> > > (iii)   a Written Consent of the Seller's board of directors and shareholders authorizing the transaction contemplated hereby.

> > (b)   At the Closing, Buyer shall deliver to Seller the following:

> > > (i)   the Promissory Note, in the form attached hereto as Exhibit A;

> > > (ii)   the Security Agreement, in the form attached hereto as Exhibit B;

4869-7024-3154, v. 9

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

(iii)     a sum equal to 75% of the Accounts Receivable set forth on Section 2.01(c) of the Disclosure Schedules;

(iv)     with respect to each Contract, an Assignment and Assumption of Contract duly executed by Buyer; and

(v)     a written consent of Buyer's board of directors and shareholders authorizing the transaction contemplated hereby.

## ARTICLE IV POST-CLOSING COVENANTS

**Section 4.01    Operation of Business**. The Buyer will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business.

**Section 4.02    Preservation of Business**. The Buyer will keep its business and properties substantially intact, including its present operations, physical facilities, working conditions, insurance policies, and relationships with lessors, licensors, suppliers, customers, and employees.

**Section 4.03    Full Access**. The Buyer will permit representatives of Buyer to have full access to all premises, properties, personnel, books, records (including Tax records), contracts, and documents of or pertaining to the Business.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE V are true and correct as of the date hereof:

**Section 5.01    Organization and Qualification of Seller.** Seller is a professional corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Virginia and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.

**Section 5.02    Authority of Seller.** Seller has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**Section 5.03    Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the balance sheet of the Seller previously provided to Buyer as of such balance sheet date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since such balance sheet date and which are not, individually or in the aggregate, material in amount.

**Section 5.04    Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances.

**Section 5.05    Inventory.** All Inventory, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable in the ordinary course of business consistent with past practice. All

7

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

Inventory is owned by Seller free and clear of all Encumbrances. The quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances of Seller.

**Section 5.06    Employment Matters.** Section 5.06 of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized.

**Section 5.07    Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**Section 5.08    No Other Representations and Warranties**. Except for the representations, and warranties contained in this Article V, neither the Seller nor any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its representatives (including any information, documents, or material delivered to Buyer, in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this ARTICLE VI are true and correct as of the date hereof.

**Section 6.01    Organization of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Florida.

**Section 6.02    Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**Section 6.03    Brokers.** No broker, finder, investment banker or other person is entitled to any brokerage fee, finders' fee or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer or any of its Affiliates.

**Section 6.04** Buyer has had every opportunity to conduct due diligence and investigate the books, records and financial information of the Seller and has verified such due diligence to Buyer's satisfaction.

## ARTICLE VII
## ADDITIONAL AGREEMENTS

4869-7024-3154, v. 9

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

**Section 7.01    Non-Competition.** For a period of 1 year commencing on the Closing Date (the "***Restricted Period***"), Seller shall not, and shall not permit any of its owners to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; or (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant.

**Section 7.02  .  HIPAA.** Buyer and Seller agree to comply with the Health Insurance Portability and Accountability Act of 1996, P. L. 104-191, and its implementing rules and regulations in consummating the transactions contemplated hereunder.

**Section 7.03    Further Assurances.** Buyer and Seller shall cooperate in good faith with the other and shall take all appropriate action and execute any documents, instruments, assignments, assumptions or conveyances of any kind which may reasonably be necessary or advisable to carry out any of the transactions contemplated hereunder.  The parties shall cooperate in providing such information as may be necessary to be in compliance with relevant sections of the Code.

**Section 7.04    Confidentiality.** Each party shall use all information that it obtains from the other pursuant to this Agreement (the "***Confidential Information***") solely for the effectuation of the transactions contemplated by this Agreement or for other purposes consistent with the intent of this Agreement and shall not use any of such information for any other purpose, including, without limitation, the competitive detriment of the other parties.  Each party may disclose Confidential Information to its respective affiliates, counsel, accountants, tax advisors and consultants as necessary to consummate this transaction. Additionally, the parties hereby agree that neither party shall make any announcement or press release regarding the nature or existence of this Agreement without the consent of the other party.  This provision shall not prohibit the use or disclosure of Confidential Information pursuant to court order or which has otherwise become publicly available through no fault of the recipient party.

**Section 7.05    Return of Information.** Each party agrees that upon request of the other party, it shall promptly deliver to the other party all Confidential Information that is not otherwise included in the Purchased Assets, including any copies, compilations, and extracts thereof, in such party's possession or in the possession of its agents, without retaining any copies thereof (including on hard disk, or any other electronic, magnetic, or digital medium) or certify in writing to the destruction thereof.  Notwithstanding the return or destruction of the Confidential Information, each party will continue to be bound by the terms and conditions of this Agreement unless otherwise set forth herein.

**Section 7.06    Survival of Representations and Warranties**. All representations and warranties of Seller or Buyer in this Agreement shall survive the Closing and shall continue to survive thereafter until the one (1) year anniversary of the Closing Date.

**Section 7.07    Indemnification by Buyer.** Buyer shall indemnify, defend and hold harmless Seller, and its shareholders, officers, directors, and representatives, from and against any and all damages, whether or not involving a third-party claim, including attorneys' fees, arising out of, relating to or resulting from (a) any breach of a representation or warranty of Buyer contained in this Agreement; (b) any breach of a covenant of Buyer contained in this Agreement; (c) any taxes related to the Business attributable to periods from and after the Closing Date; and (d) any liability of Buyer arising out of the ownership or operation of the Purchased Assets from and after the Closing Date.

**Section 7.08    Assistance of Seller.**

(a)    For so long as Seller is providing services under the Employment Agreement, but not to exceed three (3) months (the "Interim Term"), Seller authorizes

9

4869-7024-3154, v. 9

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

Buyer to use Seller billing credentialing information for the billing of Services provided by Seller or under the supervision of Seller pursuant to Seller's Employment Agreement. All fees, reimbursements and other amounts arising from dental goods or services provided during the Interim Term shall be billed by Buyer under the tax identification or provider number of Seller as provided in the foregoing sentence. Buyer acknowledges and agrees that any use of Seller's billing credentialing information shall be used solely as permitted by applicable insurance contracts and applicable laws and regulations. Buyer shall use its best reasonable efforts to obtain all necessary provider numbers and meet all enrollment requirements with third party payors as soon as practicable after the Closing.

(b)     During the Interim Term, Seller appoints Buyer as its true and lawful agent and attorney-in-fact, to take the following actions on behalf of Seller: (i) to bill and submit claims forms on Seller's behalf, and in the name of Seller or the individual clinical staff under Seller's supervision (but not other dental providers that have their own credentialing requirements), as applicable, for claims for fees, reimbursement, payment or indemnification from patients and third-party payors (including insurance companies, plans, health maintenance organizations, and state or federal funded benefit plans or fiscal intermediaries) for goods and services provided, and to respond to explanation of benefit forms and billing inquiries of payors; (ii) to seek to collect and to receive and take possession of and endorse on Seller's behalf all checks, money orders, insurance payments, and any other instruments or amounts received in payment of goods or services rendered and to deposit such funds in one or more accounts designated by Buyer, or pursuant to accounts receivable generated by such billings and claims for reimbursement and to deposit such funds in one or more accounts designated by Purchaser, and to administer such accounts; and (iii) to endorse or sign checks, drafts, bank notes, or other instruments on behalf of Seller and deposit such funds in one or more accounts designated by Buyer. Such appointment shall survive the termination of this Agreement for all accounts receivable arising from billing for goods and services provided prior to such termination, until all obligations of Seller owed to Buyer shall have been paid in full.

(c)     To facilitate such billing and collection services, Seller shall provide the Buyer a right to review records pertaining to Seller's depository accounts ("Depository Accounts"), including, the delivery of reports and weekly bank statements for the Depository Accounts as well as any other documentation reasonably necessary to determine the financial condition, cash flows and balances of the Depository Accounts. On or before 5:00 p.m. Eastern Time each Friday, or such other day as mutually agreed to by the parties, during the Interim Term, Seller shall (i) endorse to Buyer any and all checks, money orders, insurance payments, and any other instruments or amounts received in payment of goods or services rendered by or on behalf of Seller during the Interim Period for deposit in one or more accounts designated by Buyer; and (ii) remit payment to Purchaser for any funds deposited in or transferred to the Depository Accounts for amounts received in payment of goods or services rendered by or on behalf of Seller during the Interim Period. Likewise, Seller shall also be given the right to review records pertaining to services performed during the Interim Period and the payment for such services to determine the accuracy of amounts owed to Buyer hereunder.

10

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

(d)      Buyer covenants and agrees to indemnify, defend and hold Seller harmless from and against any and all claims, losses, liabilities (including taxes) arising out of or in connection with the practices described in this Section.  In the event that Seller receives a Form 1099 from any dental provider on account of billing collected during the Interim Term, Seller shall immediately thereafter issue a Form 1099 to Buyer for such amount.  For the avoidance of doubt, Buyer shall be responsible for reporting and paying all taxes on amounts collected during the Interim Term and Buyer hereby agrees to reimburse Seller for any taxes which are required to be paid by Seller on account of Seller's fulfillment of its obligations under this Section.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01      Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.01.

| | |
|---|---|
| If to Seller: | Mitchell J Magid, DMD, P.C.<br>1612 Graves Mill Road<br>Lynchburg, Virginia 24502<br>Attention: Dr. Mitchell Magid<br>Email: mmagid@aol.com |
| with a copy to: | Mandelbaum Barrett PC<br>3 Becker Farm Road, Suite 105<br>Roseland, NJ 07068<br>Attn: Casey Gocel<br>Email: cgocel@mblawfirm.com |
| If to Buyer: | GeneralHealthGroup Inc<br>244 5th Ave, L270<br>New York, NY 10001<br>Attn:  David McNichols, Chairman<br>**OR**<br>Legal Team at ArentFox Schiff |

**Section 8.02      Governing Law; Venue; Enforcement.**

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Virginia or any other jurisdiction).

(b)      In the event of a dispute between the parties arising under this Agreement, the party prevailing in such dispute shall be entitled to collect such party's costs from the other party,

4869-7024-3154, v. 9

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

including without limitation court costs and reasonable attorneys' fees, whether such sums are expended with or without suit, at trial or on appeal.

**Section 8.03    Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 8.04    Entire Agreement; Amendments.** This Agreement and the exhibits attached hereto constitute the entire agreement between the parties hereto with respect to the subject matter contained herein, and there are no covenants, terms or conditions, express or implied, other than as set forth or referred to herein. This Agreement supersedes all prior agreements between the parties hereto relating to all or part of the subject matter herein. No representations, oral or written, modifying or contradicting the terms of this Agreement have been made by any party except as contained herein. This Agreement may not be amended, modified or canceled except as provided herein or by written agreement of the parties signed by the party against whom enforcement is sought.

**Section 8.05    Assignment.** Without the prior written consent of the other party, the benefits of this Agreement may not be assigned or in any other manner transferred and the obligations may not be delegated. Subject to the foregoing limitation on assignment and delegation, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns, and no other person shall have any right, benefit or obligation hereunder.

**Section 8.06    Counterparts.** Any number of counterparts of this Agreement may be signed and delivered and each shall be considered an original and together they shall constitute one agreement.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

4869-7024-3154, v. 9

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Mitchell J. Magid, DMD, P.C.

By _____

Name: Mitchell J Magid DMD

Title:  Officer

GeneralHealth Group Inc.

By _____

Name: Ruth Berenstein

Title:  Managing Director

13

4869-7024-3154, v. 9