# EXHIBIT E

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made effective as of June 30, 2023 (the "Effective Date"), by and between **GeneralHealth Group Inc.**, a Florida corporation, with an address for notice at 244  5th Ave, L270 N ew York, NY  10001 (t he "Practice"), and **DR. MITCHELL J. MAGID**, with an address for notice at 1199 Sleepy Oak Lane, Forest, VA 24551 ("Employee"). The Practice and Employee are sometimes individually referred to as a "Party" and collectively referred to as the "Parties".

### W I T N E S S E T H:

**WHEREAS**, the Practice is engaged in the practice of dentistry at 1612 Graves Mill Road Lynchburg, Virginia 24502 (the "Premises"); and

**WHEREAS**, Employee is a duly licensed dentist in good standing in the Commonwealth of Virginia; and

**WHEREAS**, the Parties now desire to enter into an Employment Agreement to memorilaize the terms and conditions of the Employee's employment with the Practice.

**NOW, THEREFORE**, in consideration of the mutual covenants, premises and conditions contained herein, and for other good and valuable considerations the Parties hereby agree as follows:

### ARTICLE I
### EMPLOYMENT AND DUTIES

**1.1**    **Recitals**.  The recitals set forth above are hereby incorporated by reference and made a part hereof.

**1.2**    **Employment and Duties**.  The Practice hereby agrees to employ Employee as a Senior Oral Surgeon to provide professional dentistry services and certain Administrative Services (as defined below) ancillary thereto (collectively, the "Services") at the Premises during the Term (as defined in Section 3.1). The Services shall be performed in compliance with the Practice's policies and procedures, as communicated by the Practice in writing from time to time. "Administrative Services" shall include: (a) preparing and completing accurate dental and patient records in connection with the Services provided to patients; (b) collecting and maintaining information as reasonably requested by the Practice to enable the Practice to bill and collect for the Services; (c) performing and supervising the delivery of dental care and services provided to patients at the Premises with respect to whom Employee is engaged to provide Services; and (d) reasonably cooperating with the Practice in connection with the Practice's quality assurance, privacy and compliance policies and programs. The Employee shall have the right and authority to decide to perform corrective treatments for patients at no cost or a reduced cost.

**1.3**    **Acceptance**. Employee hereby accepts such employment and agrees to render such Services at the Premises.  During the Term, Employee agrees to serve the Practice faithfully and professionally, to the best of Employee's ability, to devote the necessary time, energy and skill to

1

such employment in accordance with Employee's schedule below in Section 1.4, and to use Employee's commercially reasonable efforts, skill and ability to promote the Practice's best interests in a manner consistent with such employment. The Employee shall provide those Services to patients that the employee believes are appropriate based on the Employee's professional opinion.

      **1.4**    **Schedule**. Employee shall provide the Services within the Practice's normal business hours, on such days and at such times as reasonably required by the Practice. Notwithstanding the foregoing, Employee shall work five (5) days per week in accordance with current practice, unless additional hours are mutually agreed upon. The Parties mutually acknowledge that the Practice's "normal business hours" are from 8:00am to 5:00pm Monday through Thursday, and 8:00am to 2:30pm on Fridays.

      **1.5**    **Representations of Employee**. Employee represents and warrants to the Practice as follows:

      (a)    Employee is not subject to any restrictive covenant, covenant not to compete, contract or other agreement that would limit or prohibit rendering the Services and performing the duties and responsibilities required hereunder.

      (b)    Employee shall perform Employee's duties under this Agreement in accordance with the highest ethical standards of the profession and all applicable statutory and regulatory requirements applicable to the Services.

      (c)    During the Term, Employee shall continue to be a duly qualified dentist licensed to practice in the Commonwealth of Virginia, and, upon the Practice's written request, will submit to the Practice a copy of Employee's Virginia State license and such other professional certifications/licenses that Employee may have, or be required to maintain during the Term.

      (d)    Except as herein provided, and/or as directed by the Practice and/or as reasonably required for the performance of the Services, Employee will have no right or power to bind the Practice or to enter into any agreements or understandings on behalf of the Practice.

      (e)    Employee has not at any time been excluded from participation in any governmental healthcare program, including, but not limited to, Medicare and Medicaid. Employee agrees to immediately notify the Practice of any threatened, proposed or actual exclusion from any governmental healthcare program. Employee agrees that the Practice may, if it chooses, take such steps as it deems appropriate to verify that Employee has not been excluded from any governmental healthcare program.

      (f)    Employee agrees to adhere to the policies and procedures as outlined in the Practice's employee handbook, as the same may be amended and supplemented from time to time by the Practice in its reasonable discretion, so long as the handbook, and any amendments or supplements are provided or made available to Employee in writing. Employee shall provide the Services in accordance with current practice. To the extent that such policies differ from the terms of this Agreement, the terms of this Agreement control.

2

**1.6    Exclusive Employment**. During the Term, Employee: (a) shall devote Employee's full working time and efforts, consistent with past practices in all material respects, to the performance of the Services, and (b) shall not at any time or place or to any extent whatsoever, either directly or indirectly, engage in professional practice or in any activity competitive with or adverse to the Practice, in any capacity. Except as consented to by the Practice in writing, all fees and presents of money paid or given to Employee or to the Practice in respect of the professional services rendered by Employee during the Term in connection with consultations, examinations, reports, treatment, and operations shall be the property of the Practice, and all such work shall be performed by Employee on behalf of the Practice and subject to the direction, supervision and control of the Practice, and not on Employee's own behalf, in each case. The Parties agree that the Employee shall be permitted to provide on-call Services at Lynchburg General Hospital and Virginia Baptist Hospital.

## ARTICLE II
## COMPENSATION

**2.1    Service Fee/Compensation**. Throughout the Term of this Agreement, Employee shall be compensated for his services at the rate which is the *greater of*: (i) a "Base Salary" equal to Two Hundred and Seventy-Five Thousand Dollars ($275,000.00) annualized, payable at the bi-weekly rate of Ten Thousand Five Hundred Seventy-Seven Dollars ($10,577.00); or (ii) a "Service Fee", equal to forty percent (40%) of Adjusted Production. "Adjusted Production" shall be defined as gross billings by the Practice on account of Services performed by Employee, *less* (a) laboratory fees at the rate of (40%); (b) reimbursed or refunded amounts; and (c) third party financing fees.

**2.2    Bonus Eligibility**. During the Term, Employee is eligible to participate in any bonus plans as may be adopted from time to time by Company or its subsidiaries on the same basis as other similarly situated employees of Company or its subsidiaries.

**2.3    Benefits**. During the Term, Employee is eligible to participate in any insurance- and pension-benefit programs as may be adopted from time to time by Company or its subsidiaries on the same basis as other similarly situated employees of Company or its subsidiaries. Notwithstanding the foregoing, Employee shall be permitted to maintain his health insurance plan with Anthem Blue Cross and Blue Shield, subject to reimbursement of policy premiums by the Practice.

**2.4    Paid Time Off**. Employee shall be entitled to earn paid time off each year up to a maximum of 200 hours per year, subject to Company's policies, as in effect from time to time. The Employee shall schedule the timing of such paid time off in a reasonable manner. The Employee also may be entitled to such other leave, with or without compensation, as shall be mutually agreed by Company and Employee.

**2.5    Continuing Education**. Employee is encouraged, from time to time, to attend scientific meetings, postgraduate courses and seminars, and other educational meetings concerning the practice of dentistry. The Practice shall reimburse Employee for expenses incurred by Employee to register and attend continuing education classes, in an amount not to exceed Two Thousand Dollars ($2,000) per year. All continuing education registration expenses shall be pre-

3

approved by the Practice and shall be evidenced by a bill, receipt, or voucher which documents the expense and is acceptable to the Practice.

**2.6    Reimbursement for Professional and Business Expenses**. During the Term, Employee may incur reasonable expenses for promoting Company's business, including expenses for entertainment, travel and similar items. Employee may additionally incur reasonable expenses for maintaining Employee's status as a duly licensed dentist, including expenses relating to payment of professional dues and renewal fees. Company shall reimburse Employee for all such reasonable expenses. Employee will be reimbursed only if the reimbursement is not treated as compensation to Employee under the Internal Revenue Code and the corresponding rules and regulations.

**2.7    Taxes**. The Practice shall deduct and withhold all customary social security and withholding taxes, required by law from Employee's compensation.

**2.8    No Guaranty**. The Parties each acknowledge and represent that neither Party has made any representation or guarantee to the other as to the number of patients or aggregate income of the other hereunder and that, in entering into this Agreement, neither Party has relied upon any such representation oral or written. Further, neither Party shall be required to make any referrals to the other under the terms of this Agreement.

**2.9    Billing**.

(a)    The Practice shall bill in its own name for Services provided by Employee. Where required and permitted in order to bill for third party payors, the Practice shall be authorized to, and shall have the right to bill for Employee's Services using Employee's name or provider and other identification numbers, with collections thereon to be paid to the Practice.

(b)    No other billing arrangements between the Parties relating to the Services described herein are contemplated and all other arrangements must be mutually agreed upon in writing by the Parties. Employee shall in no event bill or collect from patients or their carriers for Services rendered at the Premises.

(c)    All collections for services performed at the Premises, including without limitation the Services provided by Employee, constitute the property of the Practice. In the event that Employee receives any collections for services which are the property of the Practice, Employee shall immediately, without notice or demand, turn over such collections, to the Practice together with appropriate explanations of benefits.

**2.10    Indemnification**. The Company will defend, indemnify, and hold Employee harmless from costs, expenses, damages and other liability incurred by Employee as a result of performing services in good faith to Company, subject to the limitations and other terms of applicable law.

**ARTICLE III**
**TERM, TERMINATION AND PAYMENT ON TERMINATION**

4

**3.1    Term**. The initial term of this Agreement (the "Initial Term") shall be for thirty-six (36) months commencing on the Effective Date.  Notwithstanding the foregoing, this Agreement may be renewed by the mutual agreement of the Parties. The Initial Term and any renewal term are collectively referred to as the "Term".

**3.2    Termination for Cause**. Notwithstanding Section 3.1, Employee's employment under this Agreement shall terminate immediately for "Cause".  Cause shall mean the occurrence of any of the following events:

(a)    Employee's death or disability (which shall mean not being able to provide the Services for 180 consecutive days or any 240 days during a 12-month period); or

(b)    Employee's conviction of any felony or lesser offense involving the Practice's property or a crime involving moral turpitude; or

(c)    Any one or more acts of dishonesty by Employee resulting in, or intending to result, directly or indirectly, in gains or personal enrichment at the expense of the Practice; or

(d)    Employee's use of alcohol or illegal substances during working hours; or

(e)    Employee's neglect to perform the duties assigned to Employee pursuant to this Agreement in any manner, whether material, willful, or otherwise, provided that such failure/breach remains uncured, in the reasonable determination of the Practice, after thirty (30) days written notice by the Practice to Employee of the failure/breach, which notice shall describe the nature of the failure/breach and what actions Employee must take to cure it within the notice period; or

(f)    The suspension, limitation, revocation or non-renewal of Employee's license to practice dentistry in Virginia, license to prescribe controlled substances or status with any other third-party payor; or

(g)    Employee's failure to adequately perform the Services, or any other breach of Employee's obligations under this Agreement, provided that such failure/breach remains uncured, in the reasonable determination of the Practice, after thirty (30) days written notice by the Practice to Employee of the failure/breach, which notice shall describe the nature of the failure/breach and what actions Employee must take to cure it within the notice period; or

(h)    Employee's engagement in any conduct which the Practice reasonably concludes has materially adversely affected the financial well-being, professional standards or reputation of the Practice or has otherwise materially adversely affected any other legitimate business or professional interests and well-being of the Practice, including, but not limited to, acts of sexual misconduct and/or harassment, provided that such failure/breach remains uncured, in the reasonable determination of the Practice, after thirty (30) days written notice by the Practice to Employee of the failure/breach, which notice shall describe the nature of the failure/breach and what actions Employee must take to cure it within the notice period.

(i)      Employee's loss of professional liability insurance coverage or the Employee's inability to obtain professional liability insurance.

**3.3     Termination Without Cause**. Either party may terminate this Agreement without Cause upon sixty (60) days' advance written notice to the other. Employee must continue to perform Employee's duties as set forth hereunder and in good faith until the expiration of the notice period.

**3.4     Payments upon Termination**.   In the event that this Agreement terminates for any reason, Employee shall be entitled to receive the Service Fee or Base Salary through the termination date.

**3.5.     Effect of Termination on Earnout**. The termination of this Agreement shall have no impact on the Employee's right to receive an earnout payment(s) as set forth in the Asset Purchase Agreement dated June 30, 2023.

## ARTICLE IV
## ACTIVITIES DURING AND FOLLOWING EMPLOYMENT

**4.1     Non-Solicitation; Restrictive Covenant**. Employee acknowledges and agrees that (i) as an Employee of the  Practice, Employee shall possess and learn valuable proprietary information relating to Practice's business and operations; (ii) Practice's business is local in scope; and (iii) Practice would be irreparably damaged if Employee were to violate the restrictions contained in this Article IV.

(a)     As an inducement for the Practice to enter into this Agreement, Employee agrees that during the period that Employee is engaged by the Practice and for a period of one (1) year thereafter (such period being referred to herein as the "Restricted Period"), Employee shall not, directly or indirectly, either for Employee or for any other person or entity do any of the following:

(i) Solicit or attempt to solicit, directly or indirectly, for treatment or perform services for, either directly or indirectly, any former or existing Practice patient;

(ii) Induce or attempt to influence any employee or Practice patient to terminate his or her relationship with the Practice directly or indirectly;

(iii) Solicit or interfere with, or attempt to solicit or interfere with, either directly or indirectly, any contractual arrangement of the Practice;

(iv) Induce or attempt to influence any entity or person with a business or professional relationship with the Practice to terminate that relationship; or

(v) Solicit or interfere with, or attempt to solicit or interfere with, either directly or indirectly, any relationship which the Practice has with any person or entity which refers patients to the Practice;

6

(vi) Conduct a mass mailing, public solicitation or advertising campaign (either oral, written or any other medium or communication, including social media) within the Restricted Territory which notifies present or former Practice patients or referral sources of; (x) termination of Employee's employment with the Practice; (y) Employee's new practice; or (z) Employee's new practice location, or such other relevant information regarding Employee; or

(vii) Solicit, recruit, refer, or hire any employee of the Practice for employment elsewhere.

(b)   Employee acknowledges that the Practice's list of patients and referral sources is a valuable, special and unique asset of the Practice and, as such, is proprietary in nature. Therefore, Employee agrees that, during the Term, or at any time thereafter, Employee shall not use such patient list or referral source list, or any part thereof, for Employee's own benefit, or for the benefit of any other person or entity, and/or shall not disclose the information contained therein to any person or entity for any reason.

(c)   During the Restricted Period, Employee shall not engage in the practice of dentistry and/or any other practice and/or business materially competitive with the Practice within a five (5) miles radius of the Premises ("Restricted Territory").

(d)   The Parties expressly agree that in light of the nature of the activities in which the Practice is engaged, the restrictions set forth in this Article IV are fair and reasonable, in concept and scope, and are necessary to protect the legitimate interests of the Practice and Employee and that any violation thereof would result in irreparable injury to the Practice. Employee therefore acknowledges that, in the event of a violation or threat of violation of any of these restrictions, the Practice shall be entitled to obtain from any court of competent jurisdiction, preliminary and permanent injunctive relief, and an equitable accounting of all earnings, profits and other benefits arising from such violation, all of which shall be cumulative and in addition to any other such rights or remedies to which the Practice may be entitled at law or in equity. Employee hereby expressly waives any right to assert any affirmative claim, counterclaim or defense to the enforcement of the provisions hereinabove, that the provisions are unreasonable, unnecessary, vague or unenforceable, in whole or in part, or that there is a failure of consideration, in the event proceedings are instituted.

(e)   If a court of competent jurisdiction determines that the scope or extent of the above stated restrictions are unreasonable, the period of time shall be reduced and/or the geography shall be limited by the court or by agreement of the Parties, to such extent to allow for the broadest enforcement of this provision so that the legitimate interests of the Practice are adequately protected.

(f)   In the event that Employee violates the provisions of this Article IV, then the time frame thereof shall be extended for a period of time equal to the period of time during which such breach or breaches should occur and in the event the Practice should be required to seek relief from such breach in any court or other tribunal, then the covenants shall be extended for a period of time equal to the pendency of such proceedings, including all appeals.

(g)    Notwithstanding anything stated herein to the contrary and without prejudice to the granting of equitable relief, which is acknowledged by Employee, in the event that the Practice deems it necessary to institute or defend any action arising hereinabove, Employee expressly agrees and shall be obligated to reimburse the Practice for any and all reasonable costs and expenses including attorneys' fees incurred as a consequence of the enforcement hereof.

**4.2    Non-Disclosure of Confidential Information.** Employee recognizes that Employee possesses and will possess Confidential Information (as herein defined). Accordingly, as an additional inducement for the Practice to enter into this Agreement, Employee covenants and agrees that:

(a)    During Employee's employment with the Practice, or at any time after the termination of the employment with the Practice, Employee shall hold in strictest confidence and shall not, other than as required by law, without the prior written consent of the Practice, use any Confidential Information for Employee's own benefit or that of any third party or disclose to any person, firm, corporation or other entities, except the Practice, any of its affiliates or any of the Practice's employees. For purposes of this Agreement, and intending that the term shall be broadly construed to include anything protectable by Practice under applicable law, "Confidential Information" shall mean and include all information, and all documents and other tangible items that record information relating to the development and marketing by Practice of services and products from time to time, which at the time or times concerned are protectable by Practice as a trade secret under applicable law, which are not generally known to the Practice's competitors or patients, and which have been, or are from time to time, disclosed to or known by Employee, including, without limitation, the following especially sensitive types of information relating to the development and marketing of Practice's services and products:

(i)    Information concerning the Practice's business, including cost information, profits, sales information, pricing, accounting and unpublished financial information, business plans, markets and marketing methods, patient lists and information, including, without limitation, the identity and particular needs of the Practice's patients, purchasing techniques, supplier lists and supplier information and advertising strategies;

(ii)    Information concerning the employees, including their salaries, strengths, skills, weaknesses and personal contact information;

(iii)    Information submitted by the Practice' patients, suppliers, employees, Employees, co-venturers with Practice or referral sources for study, evaluation or use;

(iv)    Any other information not generally known to the public that, if misused or disclosed, could reasonably be expected to adversely affect the Practice's business.

Notwithstanding the foregoing, Confidential Information shall not be deemed to include any of the following: (a) that which is generally available to the public other than as a result of Employee's fault or the fault of any other person known by Employee to be bound by a duty (contractual or otherwise) of confidentiality to Practice or its affiliates (or, if applicable, any successors or assigns); or (b) that which is required by law or court order or subpoena to be disclosed by Employee, provided that Employee gives Practice prompt advance written notice of

8

such requirement and cooperates with any attempt by Practice to eliminate, limit or reduce such requirement so as to minimize disclosure.

(b)    Employee (or if Employee is deceased, Employee's personal representative) shall promptly after termination of Employee's employment for any reason whatsoever, following a request therefor from the Practice, return all tangible items that are or that contain Confidential Information to the Practice, without retaining copies, and Employee shall also return all equipment, files, software programs and other personal property belonging to the Practice.

(c)    At the reasonable request of the Practice, Employee (or if Employee is deceased, Employee's personal representative) shall make, execute and deliver all applications, papers, assignments, conveyances, instruments or other documents and shall perform or cause to be performed such other lawful acts as Practice may reasonably deem necessary to implement any of the provisions of this Agreement, and shall give testimony and cooperate with the Practice, its affiliates or their representatives in any controversy or legal proceedings involving the Practice, its affiliates or their representatives with respect to any Confidential Information.

**4.3**    **Non-Disparagement**.  During Employee's employment with the Practice, or at any time after the termination of the employment with the Practice, Employee shall not engage in any Disparagement of Practice or its owners, managers, officers, employees, contractors or patients. Any such Disparagement by Employee will constitute a material breach of this Agreement and will entitle Practice to all available remedies in law and equity.  Whether Employee has engaged in any Disparagement shall be determined based on the standard of what an ordinary, reasonable person of average sensibilities would consider to be Disparagement.  In any legal action concerning Employee's alleged violation of this non-Disparagement obligation, Employee shall have the burden of proof that Employee did not engage in any Disparagement.  For purposes of this Section 4.3, "Disparagement" shall mean the making of any statement or any other form of expression, whether verbal, electronic, written, or in any other form of communication, which would have a tendency to lower in esteem or reputation, demean, diminish, discredit, detract from, disparage, depreciate or ridicule, or which in any other manner would cause injury to the brand or reputation of a third-party, either personally or professionally.

**4.4**    **Survival**.  The provisions of this Article IV shall survive the termination and/or expiration of this Agreement.

**ARTICLE V**
**PROFESSIONAL LIABILITY INSURANCE**

**5.1**    **Required Coverage**.  The Practice shall obtain and maintain professional liability insurance coverage, covering claims against Employee and the Practice, arising out of Employee's negligence or failure to perform the Services. Such professional liability insurance shall be in a minimum amount of Two Million Dollars ($2,600,000.00) per occurrence, and a minimum annual aggregate amount of Seven Million Dollars ($7,800,000.00). For the avoidance of doubt, Employee shall be permitted to maintain his existing professional liability insurance with OMSNIC throughout his employment, subject to reimbursement or direct payment by the Practice. If Employee fails to fulfill any obligation of any insured Party under such coverage, or if such

9

coverage cannot be obtained or maintained, this Agreement may be terminated by the Practice upon written notice to Employee.

**5.2    Tail Coverage**. "Tail" coverage, if any is required to maintain coverage for the Practice with respect to Employee's Services, for claims made after the termination of this Agreement, shall be acquired and paid for by Employee, either directly or by reimbursement to the Practice (and including by offset against any amounts due Employee from the Practice) on demand should Employee fail to maintain such coverage or acquire same in a timely manner and in which event the Practice shall have the right to obtain such coverage. This obligation shall survive termination for any reason.

### ARTICLE VII
### MISCELLANEOUS

**7.1    Notices**. All notices, requests, demands and other communications (collectively, a "Notice") given or made pursuant to this Agreement shall be in writing and shall be given by personal delivery with confirmation of receipt, by recognized overnight courier, facsimile, with transmission confirmation, or by registered or certified mail, return receipt requested, postage and fees prepaid, to the Parties at their addresses set forth in the introductory paragraph hereof. Any Notice shall be deemed duly given when received by the addressee thereof, provided that any Notice sent by registered or certified mail shall be deemed to have been duly given five (5) days after the date of deposit in the United States mail, unless sooner received. Any Party to this Agreement may from time to time change its address for receiving Notices by giving written notice thereof in the manner set forth above.

**7.2    Recruitment**. In the event any employees, contractors, or other members of the Practice's staff (Employee excepted) terminate his/her employment and/or contractual relationship with the Practice, the Practice shall be solely responsible for all costs and efforts associated with the recruitment and/or replacement of such departed staff member.

**7.3    Acquisition Referral Bonus**. Employee shall be entitled to receive a referral fee in a sum equal to between 5% and 10% of the net revenues of any subsequent dental or health practices acquired by the Practice (or its affiliated entities and businesses) which were first introduced and referred to the Practice by Employee.

**7.4    Equity Options**. Following thirty (30) days of employment and subject to compliance with the terms set forth herein, the Practice shall provide Employee with the option to purchase equity in the Practice at then-current fair market value.

**7.5    Entire Agreement**. This Agreement contains the sole and entire agreement and understanding of the Parties with respect to the subject matter of this Agreement.

**7.6    Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

**7.7    Severability**. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision

of this Agreement shall be or become prohibited or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**7.8**    **Captions**. The various captions of this Agreement are for reference only and shall not be considered or referred to in resolving questions or interpretation of this Agreement.

**7.9**    **Waiver**. Waiver by either of the Parties of any breach of any provision of this Agreement shall not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereof.

**7.10**    **Amendment**. This Agreement may be amended, modified, superseded or cancelled, in whole or in part, only by a written instrument executed by the Parties.

**7.11**    **Assignment**. Neither Party may assign its obligations or duties under this Agreement, and any attempted or purported assignment or any delegation of its duties or obligations arising under this Agreement to any third party or entity without the written authorization of the other Party.

**7.12**    **Third-party Beneficiaries**. The Parties agree that the Practice, including its equity holders, parents, subsidiaries, affiliates and all related companies (each a "Third-party Beneficiary") are intended third party beneficiaries to this Agreement. The restrictive covenants and all other terms of this Agreement are intended for the benefit of, and shall be enforceable by, each Third-party Beneficiary. Employee expressly acknowledges that this Agreement shall inure to the benefit of, and shall be enforceable by, (i) each Third-party Beneficiary, and (ii) any successor of a Third-party Beneficiary through merger, name change, consolidation, or sale of a majority of equity or assets of such Third-party Beneficiary.

**7.13**    **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns, heirs and legal representatives.

**7.14**    **Rule of Construction**. In the event of any dispute between the Parties, there shall not be employed the rule to construe ambiguity against the draftsman. This Agreement has been fully negotiated between the Parties.

**7.15**    **Advice of an Attorney**. This Agreement was prepared by the law firm of Mandelbaum Barrett PC in its capacity as counsel to the Practice. Mandelbaum Barrett has recommended, prior to the execution of this Agreement, that Employee seek independent counsel to represent Employee in this matter since Employee's interests do in fact conflict with the interests of the Practice. Notwithstanding such actual conflict, by executing where indicated below, Employee (a) acknowledges that Employee understands the terms of this Agreement; (b) acknowledges that Employee is entering into this Agreement voluntarily and after having been afforded an opportunity to review this Agreement, including, without limitation, this Section 7.13, with an attorney of Employee's own selection; and (c) waives any conflict and hereby consents to the prior and continued representation of the Practice by Mandelbaum Barrett.

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

**7.16** **References**.    Terms in the singular shall be deemed also to mean and refer to the plural and vice versa, and the use of any gender shall be deemed to include all genders, all as the context may require.

**7.17** **Force Majeure**.  In no event shall either Party be liable or responsible to the other Party, or be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by any of the following circumstances beyond such Party's reasonable control (each a "Force Majeure Event"), including, but not limited to, acts of God, flood, fire, earthquake or explosion, war, pandemic, terrorism, invasion, riot or other civil unrest, embargoes, or blockades in effect on or after the date of this Agreement, national or regional emergency, strikes, labor stoppages, or slowdowns or other industrial disturbances, passage of law or any action taken by a governmental or public authority, including imposing an embargo, export or import restriction, quota, or other restriction or prohibition or any complete or partial government shutdown, or national or regional shortage of adequate power or telecommunications or transportation. In the event of any failure or delay caused by a Force Majeure Event, the affected Party shall give prompt notice to the other Party, stating the period of time the occurrence is expected to continue and use diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event. Notwithstanding the foregoing to the contrary, the Practice may terminate this Agreement if a Force Majeure Event affecting the Practice continues for a period of thirty (30) days or more.

**7.18** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

**[Signature Page Follows]**

DocuSign Envelope ID: 2860B51E-2DBF-4217-B914-F9DF44437DF5

**IN WITNESS WHEREOF,** this Agreement has been made and entered into as of the date and year first above written.

PRACTICE:

By: _RUTH BERENSTEIN_____
Name: RUTH BERENSTEIN
Title: managing principal

EMPLOYEE:

_Mitchell Magid_____

**Dr. MITCHELL J MAGID**